21-5683, Fred Courtney v. Wright Medical Technology, Inc. Good morning, your honors. Good morning. It pleases the court, I'd like to ask for four minutes of rebuttal as well. Okay, that's fine. I represent, again, Mr. Fred Courtney, who was a long-time employee of Wright Medical Technologies. He was one of their global facilities directors. And this is a case about the application of summary judgment and the ability of my client to get a trial by jury on the issue of whether or not there was pretext in his termination. And I think if you look at the record as a whole, it's clear that the district court erred by giving all of the breaks to the non-moving party as opposed to taking the evidence in the light most favorable to the moving party, which is the standard. In order to get to her conclusions that there was no pretext for my client's termination, she had to determine credibility issues, particularly with the testimony of Mr. Regan, who was Mr. Courtney's boss. If you look at the decision to fire Mr. Courtney, the reasons that were proffered by the defendant were inherently suspicious in a lot of ways. Can I ask you about that? Because it seems to me you agree that if, for example, Courtney was 35, could Wright Medical have fired him for these reasons? Well, if he were 35, he wouldn't have any legal recourse. No, but could they fire him for these reasons? Well, if he's unprotected, then a pullman at will applies. No, I understand. So the answer to my question is yes, right? They could fire him for these reasons. So the question then is how the business judgment rule operates here. Well, it does, and I think the way the district court has applied business judgment, they certainly are entitled to a business judgment instruction at the end. But if you say, well, I can use my business judgment, in every case that destroys any protection provided by... Not really. I think you have a good argument. I just think you're hanging it on the wrong thing. So, for example, if you have someone who is, let's say, 55. Let's say you have an associate who's 55, and you say, give me a summary of the case, and they send you the syllabus. You could view that as snarky. They just send you the syllabus from a Supreme Court opinion, right? You ask for a summary, they send you the syllabus. You could view that as problematic. Fair? If that happened, yes, sir. Okay. And so let's say your associate now goes to a hearing, and you get an email from a judge that says, I hear you're upset with me. It would be fair for you to conclude that the associate informed them of that. I don't think it's fair to conclude that the... Your Honor, I don't think that's an analogous situation. Well, okay, you can tell me that, but you think that would be a fair assumption, right? No, Your Honor, because I don't know what... Hold on. Associate goes to hearing, you get a call after the hearing, and the judge says, I hear you're upset with me.  You don't think that's fair? I think I would review the transcript before I took disciplinary action against the associate. That might be a better course, but it wouldn't be unreasonable for someone to think, to form a conclusion. I mean, that's what circumstantial evidence is, and that inures to your benefit at times when we look at things like Duda and what he had on the website, maybe things like that. But all my point is, is what you're saying the district court erred in, in looking at these things under Allen and the business judge Arcase Allen, which lays this out, right? They can form a reasonable business opinion from that to fire him. And I don't understand how the inferences work there. Like, what you're saying is, these facts have no basis in fact, when in reality, we can look at the emails, we can look at the letter, we know they have a basis in fact. Well, I disagree, Your Honor, because if you look at the letter, for example, from the fire marshal, the letter doesn't say anything inappropriate. It says someone was upset, and that could be a conclusion that he drew, not necessarily from anything that Mr. Courtney said or didn't say. Mr. Courtney was talking to the fire marshal at Mr. Regan's direction. And I believe that, again, the credibility of Mr. Regan is very, very important. I took his deposition, and he was obtuse, he was evasive, and it was clear from the way he approached this that he didn't, and I think a jury should be able to hear his demeanor on that, be able to look into his eyes and determine whether or not he is in fact lying. Which, again, there is so much evidence that Mr. Regan was lying that a jury should be able to hear it. And not the least of which is kind of the whole bedrock of his argument, which is, you know, Mr. Courtney was insubordinate, he was a problem. Well, I asked him, I said, well, who told you that? Well, the CEO, the CFO. Now, you're going to tell me that the C-suite is upset with a major player, and there's nothing documented about it, there's nothing but this one conversation that Mr. Regan reports, the CEO, the CFO, none of these people are even included in the initial disclosures, they're not included in the interrogatory responses to who has discoverable knowledge. It was patently untrue. There's absolutely no evidence to support that, and that is really the only way you can get to Mr. Regan's reaction to that letter as being reasonable and justified, is if he has some reason to believe that Mr. Courtney was, I guess he thinks Mr. Courtney was trying to torpedo him with the fire department. That's not the case at all. Mr. Regan was looking for cover to fire Mr. Courtney. Let me ask you, you're talking about Mr. Regan a little bit now. Mr. Courtney had pretty strong annual performance reviews, as I understand it, outstanding for a couple of years, then exceeding expectations, and then I think for 2018 met expectations perhaps. As I recall, Mr. Regan said that he had coached Mr. Courtney, I guess didn't like his style and attitude and things of that nature. Is there anything in the record that reflects, or in these evaluations, these recent evaluations once Mr. Regan came on board, that would reflect the coaching that occurred and how Mr. Courtney responded to the coaching and that sort of stuff? Because if we just look at the evaluations themselves, at least through 2018, part of which is I think when Mr. Regan is on board, the picture is of an employee who's doing just fine, or even better than fine. That's right, Your Honor. There's no indication that Mr. Regan says he coached him. Mr. Courtney denies that he received any kind of formal coaching from Mr. Regan. There's no written documentation of that. There's no progressive discipline at all in this record. Now, the appellee seizes on that to say, well, you don't necessarily have to get progressive discipline, but failure to follow a company policy can be circumstantial evidence of pretext. And that certainly is the case here when there's no progressive discipline. There's an excellent history with the company. There are several people over 40 who've been terminated or demoted by Mr. Regan. I'm not saying that's direct evidence, but it's certainly a circumstantial evidence. The average age of this department was lowered from the low 50s to the low 40s during this time period. And when you couple that with the- Can you just tell me what the evidence is of that last piece, 50s to low 40s? That's a statistical mathematics- No, I understand that. What's the evidence I would look to to form that conclusion? You would look to the ages of the- Is there an affidavit in the record that says that? I don't know, Your Honor. Just standing here, I don't know. That's based on company personnel records, I assume. Yes, sir. I don't know that there was ever an affidavit that went through and added it all up. Let me go to Judge Clay's question because I think that's a good one. Are there company personnel records in this record? Yes, sir. Okay, perfect. Where are they? I don't have a citation, Your Honor. That's all right, thanks. I believe they're in the interrogatory responses, Your Honor. Great, thank you. And then, as I said, this contentious, so-called contentious relationship with others. The other thing I would ask Your Honors to do is look very carefully at Ms. Ulrich's deposition testimony and Mr. Regan's deposition testimony. There's some overlap, but Ms. Ulrich seemed to indicate that the real reason, the straw, whatever you want to call it, was this so-called workplace violence episode. And Mr. Regan really doesn't mention that. He focuses more on this fire department issue. And I think what that said Could have different reasons, right? Well, Ms. Ulrich Excuse me. I'm sorry. Mr. Regan could have three reasons and Ms. Ulrich, the company, could add a fourth. They could add one, but I think what it shows is that the 30B6 designee Debbie Ulrich Ms. Ulrich did not know what the real reason was. If you're going to say, it's not that she added reasons, she had different slants on it and she completely omitted one of the reasons that Mr. Regan gave. And I just saw that to say is when you fire a man, you should know why you're firing him. It should be clear in the record why this man is getting fired. And none of these things, as they occurred, were treated as major events. And I would argue that this is all post facto reasoning. They went back after this lawsuit was filed and thought, okay, here are some things we can say he did that justify this termination. But none of them do justify the termination because as you get into each one of them, they are clearly false. And I'm out of time, Your Honors. Thank you. Okay. You'll have your rebuttal. Thank you. Ms. Doughty Good morning. Thank you, Your Honors. May it please the Court, opposing counsel, Whitney Doughty from Baker Donaldson on behalf of Wright Medical Technology Incorporated. As you've seen in the record and as you've heard this morning, there is a disagreement with the termination of Mr. Courtney's employment. But Mr. Courtney's claims under the Age Discrimination and Employment Act and the Tennessee Human Rights Act require and place the burden on him to show that his age was the but-for cause for his termination. Do you agree that the age was reduced from the low 50s to the low 40s of the company? I think the argument this morning was that that was in this department, and I don't necessarily agree that that's true. There was an affidavit submitted by Mr. Courtney. I believe it was an affidavit on behalf of Ken Duda talking about the changes in some of the personnel in the department. But Duda talked about specific employees. Did he talk about the overall age reduction? He did not. Oh, he did. I'm sorry. He says at 23 in his affidavit, firing these individuals from their positions reduced the average employee age in global operations from the low 50s to the low 40s. So is that accurate? I actually don't believe that that's accurate. I think that there was subsequently an affidavit submitted by Debbie Ulrich discussing some of the individuals that were identified by Mr. Courtney. Yeah, but she doesn't respond to point 23. She does not. I think the difference there is that she sets forth the facts regarding some of those separations and changes in position and disputes them. So I would say, as I stand here today, that I think those statistics are off. Wait a minute. We're not dependent on the testimony of that individual. You could look in the personnel records of the company and find out if that allegation is correct or not. And you're standing here saying you don't know that it's correct, which I'm confused by that. Does that mean you didn't look in? The allegation was made, and evaluating the allegation, you didn't look in the personnel records to see if that was true or not? Is that what you're telling us? Your Honor, what we did was for the individuals identified by Mr. Courtney in his claims and throughout his case, we responded to the specific instances that he identified with those individuals. But if they, to Judge Clay's point, they make an allegation, so this person, let's assume Duda's going to get to trial and testify, he came in, he put on his website, he cleans house, basically I'm summarizing probably unfairly to your client, and then the average age reduced from the 50s to the 40s. That's evidence, right? And here's why. And then he can explain it, and you can take issue with that. But at this point, we view it in the light most favorable to the plaintiff. Why isn't that at least evidence from which a jury could conclude that the reasons he was fired were pretextual? Your Honor, I think that you can say that, and you can say that there is a dispute there. I think that we go back to the fact that, the point that you were making earlier, that there is evidence within the record that shows that Wright Medical had legitimate non-discriminatory reasons for the termination. I agree with that. I'm not saying their reasons were or were not. I'm saying, shouldn't a jury make that decision when? So the way I view it may be a little different than both of you, but I say, okay, we all agree you met the preeminent facial case. Next step is, okay, the company gets to give their reasons. Final step is, are those reasons pretext? You can do it two different ways. You can do it by saying there's no basis in fact on those. And I agree with you. You probably went on that point, or maybe not. But the final point is the one I'm hung up on, which is he can present evidence from which a jury could conclude no, even though those reasons could have existed. The real reason they fired him is because of his age. And here's what he comes back with. He comes back with the website. He comes back with Duda's declaration, which I didn't see the district court adequately deal with. And he comes back with this point that Judge Clay just made, which is everyone can look at the personnel records and say, no, that's wrong, but no one did it. No one told anyone that's wrong. So don't we have to accept that fact at this point? I don't think you do have to accept that fact, and I don't think that that fact properly gets to a jury. Again, when we talk about the things that you just mentioned, for example, Mr. Duda's affidavit, I do think that the allegations raised in that were addressed by Ms. Ulrich. I understand the statistic piece that we're talking about, and I'll get to that in just a second. The website piece, I think that was very clearly discussed in Mr. Regan's deposition. It was not something that he wrote. It was taken out of context. It's an isolated statement. And that was a piece of information for a document that Mr. Courtney saw. What gives us, a court, district court or us, the authority to look at the evidence and say, ah, you could take that two ways, but really it's being misinterpreted. I mean, isn't that for a jury to decide at some point? Your Honor, I think that's right, but I think the important thing here is that Mr. Courtney does not offer in the record any evidence that his age was the but-for cause for his termination. Again, I think that he puts up a declaration of Mr. Duda that Ms. Ulrich undermines completely. I agree he doesn't offer direct, but he offers circumstantial. Judge Cole just went through, I think, did you go through with her or with your friend on the other side, all the ratings. Yes. Okay, so A, the ratings. B, the reduction from 50s to 40s, he offers. C, that all these, at least Duda's going to testify this is all fired. I recognize that Ulrich's going to say that's not right. And then the website. So when you put all that together, the question is, could a reasonable jury conclude that the reasons that Regan gave are pretext for age discrimination? I'm still not understanding why we get to make that call. And I guess I would just add to that, I don't know how we can credit one declaration over another declaration. That's for a jury to decide, right? I mean, if it's a genuine dispute of a material fact. Yes, and so one of the things I will say about the age differences in the department, the age differences that Mr. Courtney brings up regarding individuals who he believes replaced him in his role, I think that if you look at the case law from this circuit, if you look at the actual numbers of the ages of the individuals, I don't know, I don't think that we can say that they were legally significant in order to make a claim for age discrimination under the Age Discrimination Employment Act. The people Duda mentioned? The people that Mr. Courtney identified as his replacements and even those that Duda mentioned. I thought his replacement was 12 years younger. Am I wrong about that? So his position was split between two individuals, one of whom was older than he was and one of whom was younger. Counsel, let me ask you this. It's undisputed that prior to plaintiff coming under the supervision of Mr. Reagan, that for something like eight years there were no problems, whatever, with the plaintiff's employment? So, Your Honor, I would say that in a different way and to Judge Cole's point earlier. Mr. Courtney has good performance evaluations even under his tenure with Mr. Reagan. Under his prior... But there were no problems. He had problems with Mr. Reagan. There were no problems prior to Mr. Reagan is really what I'm asking you. Would you agree with that? Yes. I'm sorry. I didn't mean to interrupt you. I wouldn't agree that there were no problems. I would agree there were no performance issues. And there were no performance issues. He was not terminated for performance. Well, what were the problems? I'm not aware of the problems. So what were they? So the issues with Mr. Courtney prior to Mr. Reagan coming on board and then after Mr. Reagan coming on board related to his personal interactions, his what were sometimes disruptive behaviors, and that is in the record. Wait a minute. His performance evaluations were very good. Are you saying that all that's reflected in his performance evaluations? No, Your Honor. I'm not saying that it's reflected in his performance evaluations. His performance evaluations are accurate. So these are things that were not documented is what you're talking about. So there is one area where they are documented. Debbie Ulrich speaks to this in her deposition. For individuals at this level in the company, there is an evaluation that's done. It's called a nine box, I believe, and it's in her deposition where she speaks to this evaluation. And it's among senior management and talks about an employee's ability to continue to rise in the company. And there were significant concerns with Mr. Courtney's ability to do that because of his personal interactions. This is before Mr. Reagan came on board. Was that evaluation put in the record or is it just her talking about it? So it's just her talking about it. There's not a written report that comes from that evaluation. That's a meeting among senior executives and senior management. And so she testified to that in her deposition. I think my question is being misunderstood a little bit. I'm not asking about his suitability for running the company and reaching upper management. I'm asking if he, isn't it the case that he received positive evaluations and that there were no problems with his employment before he came under the supervision of Mr. Reagan? Yes, sir. He received positive performance evaluations. He was not formally disciplined at any point. And none of his interactions prior to Mr. Reagan coming to the company, I believe, rose to the level of interactions with or involvement with human resources. Is there anything in the record that would reflect the kind of concerns you just mentioned that a couple people had about Mr. Courtney would not be the sort that would be included in an evaluation? I mean, those seem to me to be the sort of items that you address with an employee and would include in an evaluation. I mean, they go to performance issues, I would think, if you don't have the attitude or not learning enough where you maybe can't advance in the company. Your Honor, I think the evidence of that in the record comes through several different deposition transcripts. Ms. Ulrich's, of course, Mr. Reagan's, of course, also Joe Portley. He speaks to the fact that he knew that Mr. Courtney rubbed some individuals the wrong way and that many in senior management didn't warm to him and that there were issues with that. Is there any evidence that this is the way this company operated, that for those sort of, I don't know if you'd call them softer performance issues, that those would not be included in a written performance evaluation or not communicated orally to the employee? Because I don't see how an employee learns to improve what their problems are if they're not, these problems aren't communicated to the employee in the annual evaluation, if they are given annually. Well, and Your Honor, I would disagree that these issues weren't raised. I'm just asking a question. That they weren't raised with Mr. Courtney. Okay. So to answer your question first, I would say that Ms. Ulrich spoke to that in her corporate representative deposition. She spoke to how these things would work, that they wouldn't necessarily be part of the annual performance evaluation. But also to your point, I would say I would disagree that these weren't brought up to Mr. Courtney. Okay. Specifically for the purpose of this case and the allegations made in this case, it's made clear through Ms. Ulrich's deposition, through Mr. Reagan's deposition, that Mr. Reagan was coaching, was working with Mr. Courtney on some of these issues because these issues were brought to Mr. Reagan when he came on board, that this was a problem. And he testifies in his deposition that those were things that he brought to Mr. Courtney's attention, was working with Mr. Courtney to address those so that he could continue to move up or to be successful in the company. And he saw no response, frankly, from Mr. Courtney. Well, I mean, I just say this as an aside. I mean, the company can operate however it wants to operate. It just seems to be an odd model to give someone these wonderful evaluations every year, but sort of you've got this sort of off-the-books, you know, concern about all of these different problems. It just seems to be an odd way. You don't need to respond. That's just a comment. I understand, Your Honor. And I will say that Mr. Courtney was under Mr. Burroughs' supervision for a very long time. Mr. Burroughs had a very different way of managing, was less, I would say, less hands-on than Mr. Reagan was. And so Mr. Courtney operated for a very long time with a lot of autonomy within the company. And when Mr. Reagan came, there was a change, and Mr. Courtney did not like that change. And so, again, I think that there's no dispute for Mr. Courtney that the relationship between Mr. Courtney and Mr. Reagan was a strained one and one that was not productive. And as his tenure under Mr. Reagan continued, it became even more strained, and more incidents began to happen, all of which are in the record, specifically the NRAC sprinkler issue that we have discussed this morning or that you've discussed this morning with opposing counsel, and the communications with the fire department, the incident that Mr. Courtney had with Jason Hoffbeck where Mr. Courtney was described by Phil Ward, another employee, as agitated and confrontational. And Mr. Hoffbeck was concerned enough about that incident to not only report it to his supervisor. Isn't there conflicting evidence? I mean, doesn't Mr. Courtney say there was no conflict, really? It was no raised voices? It was not confrontational? It just seems as to these three discrete incidents. You can believe the company's side of, you know, the facts, but a jury could believe Mr. Courtney's version of the events in terms of the e-mails, in terms of the snarkiness, in terms of, you know, your time is out, so I'm trying to go quickly. Yes, sir. Yeah, you may respond. Thank you. I think that when you look at the record evidence, that there is supporting evidence, that there is not just how Mr. Courtney views these versus how another individual at right views these. In every instance, the three specific instances that we're talking about, there is additional evidence through deposition testimony, through documents in some cases, the very letters that you saw from the Arlington Fire Department and the e-mails that follow that exchange, that show exactly what was going on. Mr. Courtney continues to disagree with the company and the company's witnesses in terms of how those incidents occurred, but he doesn't disagree that any of them occurred because he can't. He can't disagree that any of those occurred, and I believe the company has put forth evidence to support its position on each of those separate incidents. Okay, great. Thank you very much. Thank you very much. Appreciate it, Mr. Doughty. Thank you, Your Honor. You know, I think it's interesting to listen to the answers to the questions. Their theory in the district court, Mr. Regan, if you read his deposition, one way of characterizing it is he says, you know, I didn't want to fire this guy. He was a good performer, but he was just so darn hard to get ahold with, and to prove that, I'm citing all of these problems that he had before. Everybody knew he was a troublemaker. Well, to the extent that Mr. Courtney was a troublemaker, he was in a safety issue, and he was the guy that had to say no sometimes. You can't build it that way. You can't do it this way. Here's what the regs say. And so, you know, I'm not going to sit here and tell you that everybody wanted to take Mr. Courtney out for a drink. But there's nothing other than secret memos that we haven't seen that indicate that he had any real problem before Mr. Regan came along. And, you know, now they've kind of shifted in this argument to say, well, he was okay under Mr. Burroughs, but Mr. Regan and he had a different kind of relationship. Well, that's different than what they said below. And Mr. Courtney made every effort to get along with Mr. Regan. There's nothing in the record that would indicate that Mr. Courtney was the subject of the friction. It was all coming from Mr. Regan. And, you know, this Hoffbeck incident is a good incident to look at. First of all, the district court said he was a supervisor. He was not a supervisor. He was someone coming in to help consult on this facility that was being constructed. But even Mr. Hoffbeck, in his deposition, in his statement, you read his statement, he didn't file the statement against Mr. Courtney. He only filed it once somebody asked him to, once his boss says, well, you need to put that in writing. Because they were trying to, Mr. Regan was trying to find some reason to get rid of Mr. Courtney, some cover story. Ms. Orrick called it a workplace violence incident. It wasn't violent at all on Mr. Courtney's part. In fact, Mr. Hoffbeck said, yeah, I was the one who was out of line. I shouldn't have talked to those contractors that way. Mr. Courtney was just trying to tell me how to deal with folks in the south. There was no violence. In fact, Mr. Hoffbeck said, I wasn't intimidated. Mr. Courtney didn't raise his voice. Did you decide that for you to win? In other words, you've hung a lot on these incidents can be construed differently. Do we have to make that determination for the case to get reversed? No, Your Honor. I think that's the whole point. As Your Honor said, I'm not asking you to believe my client over the company. I'm just asking you to recognize that there is a clear way to construe this evidence reasonably in my client's favor, and a jury should do that. Do we have to do that for you to win? I think Your Honor has to determine that a reasonable jury could conclude that this was a pretextual agreement. That's a good answer. In conclusion, I would say that this is one of those cases where, as Judge McGurk always told me in Savannah, Georgia, a pancake, no matter how thin, always has two sides. This is a case where they certainly have their way of viewing this case. We certainly have our way of viewing this case, and there's more than ample evidence that a reasonable jury could conclude that this was a pretext. Thank you, Your Honor, for your time. Okay. Thank you, Ms. Crone, Ms. Dowdy, again for your briefing and for your arguments this morning. We really do appreciate what you've done so far. The case will be submitted. You may call the next case.